## WEEKS *v.* THE STATE, 31 Miss. Rep., 490.

### HOMICIDE.

It is unnecessary for the record to show that the grand jury were summoned at least five days before the commencement of the term of the court, or that the members thereof were over twenty-one and under sixty years of age, or that they were taken equally from each police district in the county.

The legislature, in requiring the sheriff to summon twenty men to serve as grand jurors, did not intend thereby to designate the number of which the grand jury should be composed, but only to provide a body of men, out of whom a grand jury should be selected, and it will not be error, if the whole twenty who are in attendance on the court, be not empanelled on the grand jury.

The indictment, after reciting the state and county and the term of the court, and averring that " the grand jurors of the State of Mississippi, being good and lawful men of the county of W., aforesaid, and being then and there duly elected, empanelled, and sworn," etc., is sufficient to show that the grand jury was composed of duly qualified men.

The return of the sheriff upon a special *venire*, "executed by summoning seventy-five men, as within, to pass as jurors in the case of The State v. H. Weeks," accompanied by a list of the men, is sufficient; it need not be stated in the return that the jurors are good and lawful men of the county.

A continuance should not be granted on account of the absence of a material witness, unless the affidavit shows that proper efforts were made to secure his attendance, and that they failed.

If the court should improperly refuse to grant an application for a continuance on account of the absence of a material witness, the error will be cured if the witness appear during the progress of the trial and testify in the cause.

In a criminal case, the accused has no right to demand that a change of venue be granted upon his mere *ex-parte* showing, made in accordance with the statute; the court has the right to examine other witnesses as to the grounds upon which the application is based, and if, upon such examination, the court is satisfied that the accused can have a fair and impartial trial in the county where he was indicted, it is not only his right but his duty to refuse the application.

Error to the circuit court of Winston County.   HENRY, J.

The plaintiff in error was indicted in the court below, at the September term thereof, A.D. 1855, for the murder of one Willis Norris, and at the same term was convicted and sentenced to be hung.

The record recites, "that the sheriff returned into open court a list of the following named persons, good and lawful men, citizens of the United States and residents of said county of Winston, summoned by him, according to law, to serve as grand jurors during the present term of the court, to wit:" (here the names of twenty men are inserted). "And the said jurors so returned, having appeared in open court, it was ordered by the court that sixteen of said jurors be drawn and empanelled to serve as grand jurors, etc., and thereupon the clerk and sheriff proceeded to draw said grand jury according to law, etc., whereupon the following named persons were drawn as aforesaid," (naming them). The record then shows that a foreman was appointed, and that the grand jury was regularly sworn and a bailiff appointed and sworn.

The record further recited, as follows: "This day came the grand jury into open court, under the charge of their proper officer, and through their foreman, James W. Wilcox, returned into open court a bill of indictment against the following named person, for the following named offense, to wit:

"The State of Mississippi　}　Indorsed a true bill, by
　　　　v.　　Murder.　　　}　　James W. Wilcox,
　　Harvey Weeks.　　　　}　foreman of the grand jury.

"Whereupon the jury retired," etc.

Then follows in the record a copy of an indictment against Harvey Weeks, for the murder of Willis Norris, with the following indorsement thereupon: "Prosecutor George W. Norris, A true bill. James W. Wilcox, foreman of the grand jury."

The statement of the indictment, in reference to the grand jury, is as follows:

"The State of Mississippi,　}
　　Winston county.　　　　}

"In the circuit court of said county, at the September term thereof, in the year of our Lord, one thousand eight hundred and fifty-five.

"The grand jurors of the State of Mississippi, being good and lawful men of the county of Winston aforesaid, and being then and there duly elected, empanelled, sworn and charged to inquire in and for the body of the county of Winston aforesaid,

in the name and by the authority of the State of Mississippi, upon their oaths present," etc.

A special *venire* was issued, commanding the sheriff to summon seventy-five good and lawful men of the county "to be passed upon as jurors in the case of the State of Mississippi v. Harvey Weeks." A list of seventy-five persons was appended by the sheriff to the writ, and he thereupon made the following return : "Received and executed by summoning seventy-five men as within, to pass as jurors in the case of The State v. Harvey Weeks."

An application was made by the prisoner for a continuance, for the want of a witness, Wm. Goyne. The affidavit of the prisoner upon which this application was based, after reciting the absence of the witness and the materiality of his testimony, gives as a reason of his non-attendance, " That the prisoner has been confined in the jail of Lowndes county since a short time after his arrest and imprisonment, and has had but little opportunity of conferring with his counsel, or to procure testimony for his defense ;" but it shows no effort to have the witness subpœnaed. The record also shows that this witness was present at the trial and testified on behalf of the prisoner.

The prisoner, before he was put on his trial, made an application for a change of venue. This application was based on his own written affidavit, supported by that of two witnesses, to the effect that, owing to the prejudice in the public mind in Winston county against the prisoner, he could not have in that county a fair and impartial trial for the offense with which he was charged.

The record then recites that, upon the consideration of this motion, H. Goyne (one of the affiants for a change of venue) and three other witnesses " were introduced and duly sworn and examined, touching the change of venue in this case," etc., . . " and that, after a full investigation, the court being fully satisfied from the evidence of these witnesses, that the prisoner could have a fair and impartial trial in said county of Winston, and that no cause exists for a change of venue," refused the application.

The testimony of these witnesses is not set out in the record.

On the trial, the state proved by Mrs. Jane Norris, the widow

of the deceased, that some two or three weeks previous to the killing of her husband, there originated a state of unfriendly feeling between her husband and Hiram Weeks, the father, and William Goyne, the brother-in-law of the prisoner; that they abused him, and offered him violence at his own house. That some few days thereafter, and some twelve or fifteen days before the killing, she and her husband met the prisoner, and he refused to speak to them; that on Sunday evening, the 25th day of March, 1855, being the day before the killing, the prisoner and Hiram Weeks, and William Goyne, passed the residence of her husband in company; that on the same evening and before nightfall, Hiram Weeks and William Goyne returned, and stopped at the gate, and "cursed, and abused, and denounced her husband;" that Goyne tried to ride his horse over him, and challenged him to go out from his house and fight; that she interfered, and by her importunities suppressed any "further difficulty;" and Goyne and Hiram Weeks then left.

That on the morning of the 26th of March, 1855, about eight or nine o'clock, the prisoner came to her husband's house; that he walked thither, and was dressed in black; had on a black frock coat and a black fur hat; that prisoner and her husband remained about the house and yard, talking about swapping horses, until about 11 o'clock A.M., when her husband took his ox-cart and went to his new ground, a short distance from the house, to bring a load of wood; that prisoner went with him; that owing to the unfriendly feeling existing between them, and the conduct of Goyne and Hiram Weeks on the day before, she kept a watch on prisoner, both whilst at the house and after he left and went to the new ground; that she saw him with her husband on the new ground; that just before the killing she saw her husband squatted down and Weeks standing near him. They appeared to be in conversation about something. They were in this position at twelve o'clock M., when she went to the door and called her husband to come to dinner. Her husband answered, and she turned round to go back into the house, and had taken but one step, when she heard a gun or pistol fire in the direction of her husband and the prisoner; she immediately turned and saw her husband lying on the ground, and exclaimed that "Harvey

Weeks has killed my husband." She ran immediately to the place where her husband was lying on the ground; he moved his lips and tried to speak, but could not; and died in a few moments. Near her husband, who was shot with a ball under the left nipple, she found a pistol "*barrel*," with a percussion-lock attached under the barrel, and a part of the stock broken. The pistol was peculiar in appearance; she had never seen one like it, and she identified the one in court as the same. She did not see the prisoner after her husband was shot. She did not look for him, her attention being given entirely to her husband; she had a clear and distinct view from the house to where she saw Weeks and her husband just before the latter was shot, but there was timber on either side. She had known Weeks for several years and was well acquainted with him and his size and general appearance; that she could not and did not recognize his features on the new ground when with her husband, the distance being too great; but she did recognize his dress and general appearance, and is perfectly satisfied that the prisoner is the same man who was with her husband that morning whilst at the house. She never saw him afterwards until he was arrested, and was on trial before the committing court.

Margaret Van Laningham, Ellen Weeks and Mrs. Blain were at the house of the deceased on the morning he was killed, and testified as to the prisoner's arrival there, and his conduct when at the house, and his departure with the deceased at about 11 o'clock A. M., to the new ground; the same in substance as Mrs. Norris. These witnesses were engaged in quilting in a room in the house, and did not see either the prisoner or the deceased after they left for the new ground. They stated that they heard the firing of the pistol at 12 o'clock M., immediately after Mrs. Norris had called her husband to dinner, and that Mrs. Norris then exclaimed that "Harvey Weeks has killed my husband." They saw the dead body and the pistol, which they described as Mrs. Norris had done, and recognized when shown in court.

Henry Van Laningham testified, that about ten days before Norris was killed, the prisoner, being a little intoxicated, denounced the Norrises, and swore he could whip the whole family, and any one who would protect them. The next day after

this—the witness being Willis Norris' father-in-law—the prisoner came to him and apologized for the remarks he had made about the Norrises in his presence, and said he did not wish to hurt witness's feelings; but he did not retract what he had said, nor express any regret for his remarks, so far as the Norrises were concerned. Witness was one of the jury of inquest, and saw the pistol found by the side of Norris, and recognized the one in court as the same.

Daniel Blain was sent for soon after the killing, and he described the wound on the deceased as the other witnesses, and identified the pistol.

Simon Berry testified, that he lived one and a-half miles from the deceased; that previous to the 26th of March, 1855, the prisoner had hired with him as a laborer, for about four months. That prisoner was absent from his house on Saturday, the 25th March, all day, and did not return until about one or two hours before day-break, on the morning of the 26th. That he heard prisoner, on the morning of the 26th, talking to himself rather loudly in his room. Prisoner said " he would have satisfaction." Witness went in prisoner's room, and saw he was a little intoxicated, though not much. He asked prisoner from whom he was going to get satisfaction? Prisoner replied, that he "had not said who." Prisoner had two pistols in his room, and witness saw him put them on his person, under his clothes. Witness never saw prisoner have any pistols before that time. Witness identified the pistol in court, and which had been shown to and identified by the other witnesses, as one of the pistols in the possession of the prisoner on the morning of the 26th of March. The prisoner left witness' house soon after breakfast; he bid the witness farewell, which was unusual for him to do when he left. The prisoner left all his clothes at witness' house, except those he wore; and he never returned after he left that morning. This witness on cross-examination proved that the prisoner had been angry with a neighbor, but that matter had been amicably adjusted previous to the 26th March, 1855; he also proved that the prisoner was a quiet and peaceable man.

Mrs. Berry, Miss Berry, and the wife and daughter of Simeon Berry, and Mrs. Ellen Berry, his daughter-in-law, were all pres-

ent at his house on the morning of the 26th of March, and testified, in substance, the same as he did on his examination-in-chief.

R. C. Miller testified that hearing, on the 26th March, 1855, that Willis Norris had been killed, he went to his house, and thence he went in pursuit of the prisoner; that on that evening and night he went to the residence of prisoner's father, and also to the residence of his relatives in the neighborhood, and made inquiries respecting him, but he could not learn any thing about him. That on the morning of the 29th of March, he found the tracks of two horses—one of which, from a peculiarity in the shoeing, was easily distinguishable from other horse-tracks. That he traced these tracks from the house of prisoner's father, for about seventeen or eighteen miles, where he found prisoner's horse tied in a low swampy place in the woods, back of the house of one of his relatives. That he saw there the peculiar track before alluded to, and saw a place where the horse had made it, had been hitched and removed. That before reaching this place he met prisoner's father, who was on horseback. That he could not find or hear of prisoner until the 31st of March, when he came to Louisville (the county seat of Winston county), in company with Hiram and James Weeks.

Samuel Harris was with R. C. Miller in his search for prisoner, and testified in substance the same.

Charlotte Weeks, for the defendant, testified, that she had dinner earlier than usual on the 26th March, 1855, because Wm. Goyne and wife were on a visit at her house, and wanted to get home by 12 o'clock M. That dinner was ready at 11 o'clock A. M., at which time prisoner came there and ate dinner, and remained until late in the evening. That she saw nothing unusual in his appearance that evening. That late in the evening, prisoner and her husband left on horseback; but they went in opposite directions. She did not see prisoner afterwards, until she saw him in jail. Witness is mother of the prisoner. Upon cross-examination, she denied having stated to R. C. Miller, on the 26th of March, and George W. Norris, on the 27th, in reply to a question by them as to where prisoner was, " that she did not know, and had not seen him since the evening of the 25th."

William Goyne, for defendant, testified that he was at the house of Hiram and Charlotte Weeks on Monday the 26th March, 1855; that prisoner arrived there at 11 o'clock A. M., and ate dinner; that he saw nothing unusual in his appearance. Upon cross-examination, stated that he was the brother-in-law of prisoner, and was the same person who had cursed and abused deceased. That he did not see prisoner after 12 o'clock M., on the 26th March, until he saw him in jail. Witness denied having stated to Miller and Hunt, on the 26th March, or subsequently, that he had not seen prisoner since the evening of the 25th.

Mrs. Goyne and Miss Weeks, for defendant, testified the same as last witness, on his examination-in-chief.

J. R. Goyne, for the defendant, testified that William Goyne reached his house on Monday the 26th March—it being about one and a-half miles from Hiram Weeks'—at 12 o'clock, and that they soon after went to the field to plough.

The state then introduced R. C. Miller and two other witnesses, who proved that they were in search of the prisoner soon after the killing, and visited his father's house, and, upon inquiry made of them, the defendant's witnesses, Mrs. Goyne, Mrs. Weeks, Miss Weeks, and William Goyne, denied knowing any thing of him, and stated they had not seen him since the evening of the 25th of March.

All the witnesses who testified as to the time of day, spoke from their judgment and opinion; none of them having verified it by a time-piece. It was proven that Hiram Weeks, father of the prisoner, resided about two miles from the residence of the deceased.

As no question was raised in this court in reference to the instructions given by the court, it is not deemed necessary to set them out.

The jury having found a verdict of guilty against the defendant, he moved for a new trial, which being overruled, he tendered his bill of exceptions, embracing the evidence in the cause; and sued out this writ of error.

*Freeman & Dixon*, for plaintiff in error,

Filed an elaborate brief, in which they made the following points :

1. The record does not show that the grand jury was legally constituted. It does not show that the grand jury were summoned at least four days before the term of the court; nor that they were taken equally from each police district. See Session Acts of 1854, p. 468.

2. The act of 1854 requires the sheriff to summon twenty men " to serve as grand jurors for the term." The record shows that the whole twenty were summoned, and in attendance; but the court, instead of empanelling the whole, required sixteen to be drawn by lot from the number, and constituted them a grand jury. This was error.

3. The indictment does not state that the grand jury " were taken from the body of good and lawful men of the county aforesaid, at the term aforesaid, of the court aforesaid;" and it is insufficient on that account.

4. The record does not state that the indictment therein contained was returned into court a true bill *at that term, or any other term.* The record merely recites that a bill of indictment was returned against the prisoner for murder, indorsed, etc., and then follows the indictment; but there is no allegation in the record that this is the *indictment so returned.* Moreover, the indictment copied is not indorsed as the indictment is stated in this record to be indorsed. The indictment copied in the record, has this material indorsement, " Prosecutor, George W. Norris." The one noticed in the record, is stated therein to be indorsed, " a true bill, James W. Wilcox, foreman of the grand jury."

5. The return of the sheriff on the special *venire*, is insufficient, because it does not state that he summoned the within-named jurors; nor that they were good and lawful men of the county, householders, or freeholders, and citizens of the United States. Besides, it appears that the clerk selected the names, and the sheriff only summoned them. This was clearly error.

6. The court erred in refusing to change the *venue.* The prisoner had done all that the statute required of him, to procure a change of *venue.* In a criminal case, when the statutory

provisions are complied with, it is compulsory on the court to change the *venue;* but in civil cases the rule is different, for then the statute expressly provides that the court may hear witnesses on both sides.    Why this difference in the provisions of the two statutes, unless a different rule, based on the distinct and different provisions of each, was intended to be established?

7. The court erred in refusing the application for a continuance.    The affidavit was sufficient.

8. The evidence is insufficient to convict the prisoner; and on this point they reviewed the evidence at length.

*D. C. Glenn,* attorney general,

Argued the case orally.

HANDY, J.:

The plaintiff in error was tried and convicted at the September term, 1855, of the circuit court of Winston county, for the murder of one Willis Norris; and the case is brought to this court upon a bill of exceptions, taken to the action of the court below in overruling a motion for a new trial.

Several objections have been raised and urged here, to the regularity of the summoning of the grand jury which found the indictment; the constitution of the grand jury; the return of the indictment into court; the sufficiency of the indictment with reference to its showing that the grand jury were composed of duly qualified men; and the sheriff's return upon the special *venire* as to his summoning the jury.

We have examined the record with reference to these several objections, and are satisfied that they are untenable.

An exception was taken to the refusal of the court to continue the cause on the application and affidavit of the prisoner.    But from the statement of the affidavit, it does not appear that any effort was made to procure the attendance of the absent witness; and it moreover appears by the subsequent details of the record, the witness actually appeared and testified in behalf of the prisoner.    Even, therefore, if he was entitled to a continuance, as he clearly was not upon his affidavit, all ground of objection is removed by the witness's appearing and testifying on the trial.

Another exception was taken to the refusal of the court to change the venue upon the application and affidavit of the prisoner, accompanied by the affidavits of three witnesses, stating that "owing to the prejudice existing against the prisoner in the county of Winston, he could not have a fair and impartial trial in that county." It appears that, in considering this application, the court examined one of the affiants and several other witnesses, among whom was the sheriff of the county, under oath, as to the grounds of the application; and being satisfied from the evidence that the prisoner could have a fair and impartial trial in the county, the application was refused.

It is now insisted that the court was bound to act in the matter upon the affidavits of the prisoner and others offered by him, and it was error in the court to examine other witnesses in order to determine whether he could have a fair and impartial trial in the county.

The provision of the statute is, that "it shall and may be lawful for any circuit court or judge thereof in vacation, to change the venue in a criminal case to any adjoining county, on a sufficient showing made by the prisoner on oath, supported by the testimony of one or more credible witnesses, that he cannot have a fair and impartial trial in the county where the offense is charged to have been committed." Hutch. Code, 1007, Art. 6.

In giving the right of a fair and impartial trial to the accused, it is manifest that the statute contemplates that, whenever a change of *venue* shall be applied for, to that end, it shall be determined by the court whether there is just ground for the application. Public justice as well as private right must be considered as equally within the contemplation of the statute, giving this power to the court. Its language confers power on the court to grant the application, but it is not imperative; and the exercise of the power must necessarily be a matter within the sound discretion of the court. And, although the court would have full power to grant the application upon the mere showing mentioned in the statute, without further inquiry or proof; yet cases may arise in which justice and right might require that the court shall not receive such testimony as conclusive ground for granting the application. It might be sug-

gested in behalf of the state, that the witnesses whose affidavits were introduced to sustain the application, were not worthy of credit, or that they were incapable of forming a correct judgment upon the matter stated by them, or that the state of public opinion in the county was clearly not to the prejudice of the accused. If this were the true state of the case, it would be a flagrant perversion of justice to grant the application; and the true state of facts could only be ascertained by a proper examination of witnesses whose situation and means of knowledge upon the subject would entitle their testimony to full confidence. Hence the nature of the power conferred upon the court must require that, whenever the ends of complete justice render it necessary, the court should exercise the power to inquire and determine whether it is proper that the application should be granted; and if, upon such investigation, the court is satisfied that the reasons alleged for the application have no just foundation, the application should be refused, and it follows, that the right of a change of venue, upon a mere application of the prisoner, supported by the affidavit of himself, and one or two more witnesses, is not a matter of absolute right, beyond the power of the court in the exercise of its sound legal discretion.

In the present case, it appears that the court examined one of the affiants upon whose testimony the application was made, and several other witnesses, upon the subject matter of the application. Neither the testimony of these witnesses, nor the reasons which caused their introduction, appear upon the record. And, as it was competent for them to be introduced and examined, and as their testimony might fully have justified the court in determining that the reason stated by the prisoner and his affiants as the ground of the application, was unfounded, it must be presumed that the testimony was sufficient to justify the action of the court in refusing the application.

No particular objection is made to the instructions given to the jury; those asked in behalf of the state as well as those asked on the part of the prisoner, having all been given; and the principles of law applicable to the contested points in the case, were thereby very fully and fairly presented to the jury.

The only point in the case which appears to have been con-

tested on the trial, was that of an *alibi* attempted to be proved in behalf of the prisoner. The widow of the deceased and four other witnesses proved that the prisoner was near the deceased about the hour of twelve o'clock M., on the day on which he was killed. On the contrary, several witnesses on his part state that the prisoner was at his father's house, about two miles from the place where the deceased was killed, from eleven o'clock on that day until late in the evening. But other witnesses testify that several of these witnesses in behalf of the prisoner, and who are his near family relations, had previously declared when pursuit was made, after the killing, that they had not seen him since the day before the deceased was killed. The question of credibility of the witnesses was, therefore, directly presented for the consideration of the jury, upon proper instructions by the court upon the point; and the verdict is conclusive of that question.

In all other respects, the evidence goes fully to sustain the verdict; and after a careful examination of the whole record, we are of opinion that there is no error in the judgment, and that it must be affirmed.

Judgment affirmed.